No. 23-2386

# United States Court of Appeals for the Federal Circuit

METACEL PHARMACEUTICALS, LLC,
*Plaintiff-Appellant*,

v.

RUBICON RESEARCH PRIVATE LIMITED,
*Defendant-Appellee*.

Appeal from the United States District Court for the District of New Jersey in No. 2:21-cv-19463-EP-JRA, United States District Judge Evelyn Padin

**CORRECTED OPENING BRIEF OF APPELLANT METACEL PHARMACEUTICALS, LLC NON-CONFIDENTIAL**

ARNALL GOLDEN GREGORY LLP
Matthew D. Zapadka
Kevin M. Bell
2100 Pennsylvania Ave NW, Suite
350S Washington, DC 200037
(202) 677-4930

*Counsel for Plaintiff-Appellant*

January 19, 2024

## PATENT CLAIM LANGUAGE AT ISSUE

### U.S. Patent No. 10,610,502 Claims 1 and 2

1. A method of relaxing muscles or treating spasticity in a subject in need thereof comprising administering to the subject an effective amount of an aqueous oral solution comprising (i) baclofen, (ii) a buffer comprising citric acid, a salt of citric acid, or any combination thereof, and (iii) optionally one or more preservatives, wherein prior to the administration, the amount of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid in the oral solution is determined to be below a threshold level and the oral solution is stored after the determination, but prior to the administration, at from about 2 to about 8° C.

2. The method of claim 1, wherein the threshold level is 0.2%.

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Metacel Pharmaceuticals, LLC certify the following information in compliance with Federal Rule of Appellate Procedure 26.1 and Federal Circuit Rules 26.1 and 47.4:

1. The full name of every party or amicus represented by us is:

    Metacel Pharmaceuticals, LLC.

2. The names of the real parties in interest (if the party named in the caption is not the real party in interest) represented by us are:

    None.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

    None.

4. The following law firms, partners, and associates appeared for the party now represented by us in the trial court or are expected to appear in this court:

    Kevin M. Bell, Matthew D. Zapadka, Scott A.M. Chambers, Richard J. Oparil Erin N. Winn, ARNALL GOLDEN GREGORY LLP.

    Arnold B. Calmann, Katherine A. Escanlar, SAIBER LLC

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

    None.

6. Provide any information required under Fed. R. App. P. 26.1(b) and 26.1(c).

    None.

Dated: January 19, 2024

Respectfully submitted,

*/s/* Matthew D. Zapadka

Matthew D. Zapadka
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave NW,
Suite 350S
Washington, DC 200037
(202) 677-4930

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

CONFIDENTIAL MATERIAL OMITTED. The material omitted on pages 6, 7, 9, 10 describes certain elements of Appellant's patent; the material omitted on pages 13, 14, 15, 20, 21, 22, 40, 43 and 44 describe the temperature in which Appellee's product is stored.

**Page(s)**

CERTIFICATE OF INTEREST ........ I

TABLE OF CONTENTS ........ III

TABLE OF AUTHORITIES ........ VI

STATEMENT OF RELATED CASES ........ 1

STATEMENT OF JURISDICTION ........ 2

STATEMENT OF THE ISSUES ........ 3

STATEMENT OF THE CASE ........ 3

I. Background ........ 3

II. The Importance of the '502 Patent's Claimed Storage Condition ........ 6

III. Rubicon's Non-Infringement Contentions ........ 7

IV. Rubicon's Summary Judgment Motion and Rubicon's Corporate Testimony Concerning the Storage Limitation ........ 11

V. Due to the District Court's Scheduling Order, The Bulk of Expert Discovery was Conducted After Summary Judgment Briefing and Could Not Have Been Considered by the District Court in

Rendering its Order Granting Summary Judgment in Favor of Rubicon ........ 16

VI. The Competing Expert Opinions and Unrebutted Opinion of Metacel's Expert Regarding the Storage Limitation ........ 17

VII. The District Court's Order on Summary Judgment ........ 23

VIII. The District Court's Order on Metacel's Motion for Reconsideration ........ 26

SUMMARY OF ARGUMENT ........ 29

STANDARD OF REVIEW ........ 30

ARGUMENT ........ 32

I. The District Court Erred by Relying Soley on the Explicit Text of the ANDA Product Label and Failing to Consider the Surrounding Relevant Circumstantial Evidence ........ 34

II. Summary Judgment was Inappropriate Because There Were Genuine Issues of Material Fact as to whether Appellee's ANDA Induces Downstream Users to Infringe the Storage Limitation. ........ 39

III. The District Court Erred by Granting Summary Judgment on an Issue that Appellee Failed to Identify in its Non-Infringement Contentions in Violation of the Local Patent Rules and Federal Rules of Civil Procedure ........ 45

IV. Appellee's Failure to Provide Discovery on the Storage Limitation as Required Under the Federal Rules of Civil Procedure Barred Appellee from Using that Same Information as Evidence in its Motion for Summary Judgment. ........ 47

V. Appellee's Failure to Identify its Storage Limitation Argument in its Non-Infringement Contentions in Violation of the Local Patent Rules Barred Appellee from Using that Same Information as Evidence in its Motion for Summary Judgment....................52

CONCLUSION....................58

ADDENDUM....................60

CERTIFICATE OF SERVICE....................1

CERTIFICATE OF COMPLIANCE....................1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amarin Pharma, Inc. v. W.-Ward Pharms. Int'l Ltd.*,
407 F. Supp. 3d 1103, 1112 (D. Nev. 2019) ............................. 35

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)...... 29, 37

*AstraZeneca LP v. Apotex, Inc.*,
633 F.3d 1042, 1060 (Fed. Cir. 2010) ..................................... 34, 40

*Canon, Inc. v. Color Imaging, Inc.*,
227 F.Supp.3d 1303 (2016) ....................................................... 56

*Celgene Corp. v. Hetero Labs Ltd.*,
No. 17-3387, 2021 U.S. Dist. LEXIS 159262 (D.N.J. Mar. 29, 2021)
.............................................................................................. 54

*Celotex Corp. v. Catrett*,
477 U.S. 317, 323 (1986) ......................................................... 38

*Cunningham v. Fulton Cty., Georgia*,
785 F. App'x 798, 803-04 (11th Cir. 2019) .............................. 47

*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*,
845 F.3d 1357, 1367 (Fed. Cir. 2017 ........................................ 43

*Ferring B.V. v. Watson Labs., Inc.-Florida*,
764 F.3d 1401, 1408 (Fed. Cir. 2014)........................................ 34

*FTC v. Actavis, Inc.*,
570 U.S. 136, 142-43 (2013) ..................................................... 31

*Genentech, Inc. v. Amgen, Inc.*,

289 F.3d 761 (Fed. Cir. 2002) .................................................. 53

*Glaxosmithkline LLC v. Teva Pharms. USA, Inc.*,
7 F. 4th 1320 (Fed. Cir. 2021) .......................................... 35, 36

*Graco Children's Products Inc. v. Kids II, Inc.*,
1:13-CV-1183-TWT, 2018 WL 1509192 (N.D. Ga. Mar. 26, 2018) ... 32

*HZNP Medicines LLC v. Actavis Labs. UT, Inc.*,
940 F.3d 680, 699 (Fed. Cir. 2019) .......................................... 35, 36, 37

*Janssen Pharm., Inc. v. Mylan Labs. Ltd.*, 20CV13103 (EP) (LDW),
2023 WL 3605733, (D.N.J. May 23, 2023) ............................ 27, 40, 51

*King v. Verizon New Jersey, Inc.*, Civ. No. 21-11226 (RMB/MJS),
2023 WL 5817126, at *9 (D.N.J. Sept. 6, 2023) ....................... 49

*Lexion Med., LLC v. Northgate Techs., Inc.*,
641 F.3d 1352, 1358 (Fed.Cir.2011).......................................... 29

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913, 915, 125 S. Ct. 2764, 2768, 162 L. Ed. 2d 781 (2005) 40

*Nicini v. Morra*,
212 F.3d 798, 805 (3d Cir.2000)................................................ 30

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
467 F.3d 1355, 1364 (Fed. Cir. 2006) ...................................... 30, 31

*Par Pharm., Inc v. QuVa Pharma, Inc.*, No. CV 17-6115-BRM-DEA,
2018 WL 949985, at *5 (D.N.J. Feb. 8, 2018) .......................... 46

*Seahorse Oceanside Apartments Condo. Ass'n, Inc. v. Homesite Ins. Co.*,
446 F. Supp. 3d 1097, 1106 (S.D. Fla. 2020) ........................... 47, 50

*Shire LLC v. Amneal Pharms., LLC*,
802 F.3d 1301, 1306 (Fed. Cir. 2015) ...................................... 31

*Sloan Valve Company v. Zurn Industries, Inc.*,
2013 WL 6132598, (N.D. Ill., November 10, 2013) .................. 55

*Tritek Techs., Inc. v. United States*,
63 Fed. Cl. 740, 743 (2005) ........................................................ 48

*Tritek Techs., Inc. v. United States*,
208 F. Appx. 869 (Fed. Cir. 2006) ............................................ 48

*Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*,
887 F.3d 1117, 1129 (Fed. Cir. 2018)............................ 32, 24, 40, 43

*Water Techs. Corp. v. Calco, Ltd.*,
850 F.2d 660, 668 (Fed.Cir.1988) ............................................. 34

*Watts v. Univ. of Delaware*,
622 F.2d 47, 50 (3d Cir. 1980) .................................................. 38

**STATUTES**

21 U.S.C. § 355 ............................................................ 1, 3, 4, 31, 32

28 U.S.C. § 1295(a)(1) ............................................................ 1

28 U.S.C. § 1331 ............................................................ 1

28 U.S.C. § 1338(a) ............................................................ 1

28 U.S.C. § 2201 ............................................................4, 31, 32

35 U.S.C. § 271 ............................................................4, 31, 32

**COURT RULES**

New Jersey Local Patent Rule 3.6 ................................................. 6,54

New Jersey Local Rule 56.1 ............................................................ 11

Federal Rule of Civil Procedure 26 .......................................... 46-48

Federal Rule of Civil Procedure 37 .......................................... 47-51

Federal Rule of Civil Procedure 56(a) ...................................... 30,38

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant states that to the best of its knowledge: No appeal from the same trial court action was previously before this or any other appellate court or agency and there are no cases pending in any court or agency that will directly affect or be directly affected by the Federal Circuit's decision in this appeal.

## STATEMENT OF JURISDICTION

Appellant, Metacel Pharmaceuticals, LLC ("Metacel"), filed a timely notice of appeal on September 6, 2023 seeking to overturn the district court's finding of summary judgment in favor of Defendant/Appellee, Rubicon Research Private Limited ("Rubicon"). Appx6011-6019; Appx6021-6022. The district court had jurisdiction over Metacel's claims under 28 U.S.C. §§ 1331, 1338(a), and 2201 and 21 U.S.C. § 355(c)(3)(D). The United States District Court for the District of New Jersey entered its final judgment on August 31, 2023. Appx2-3; Appx5-14. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

Whether the district court erred in entering summary judgment in favor of Rubicon while expert discovery was ongoing but which later established facts that conflicted with the district court's findings of fact and law, including the district court's disregard of Metacel's expert reports contain opinion that genuine issues of material fact, and whether the district court erred by not adhering to the court's rules and relying upon Rubicon's prejudicial delay in asserting its arguments related to the storage conditions of the generic drug product.

## STATEMENT OF THE CASE

### I. Background

U.S. Patent No. 10,610,502 ("the '502 Patent") issued on April 7, 2020, and is entitled "Oral Baclofen Solutions." Appx6266-6271. Metacel is the owner of the '502 Patent and holds the approved New Drug Application for its baclofen oral solution 5mg/5mL sold under the trademark Ozobax® (NDA No. 208193). Appx2009-2011. Rubicon markets a broad array of products, and purports to have sold over 1.3 billion extended units in the US as of 2020, with over 130 products in development.

Under 21 U.S.C. § 355(b)(1), the ’502 Patent is listed in the Food and Drug Administration (“FDA”) publication Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations as covering the Ozobax® brand oral solution. Metacel’s Ozobax® product is the first FDA-approved oral liquid baclofen. It is indicated for the treatment of spasticity resulting from multiple sclerosis, particularly for the relief of flexor spasms and concomitant pain, clonus and muscular rigidity.

Rubicon submitted Abbreviated New Drug Application (“ANDA”) to the FDA seeking approval for a generic version of Metacel’s Ozobax 5mg/5mL product (identified as “ANDA No. 214445”).[1] Appx1793-5557. In a letter dated September 15, 2021 (“Notice Letter”), Rubicon notified Metacel that it submitted ANDA No. 214445 to the FDA under § 505(j) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 355(j)). The Notice Letter stated that ANDA No. 214445 (“the accused product”) sought FDA approval necessary to engage in the commercial manufacture, use, or sale of generic baclofen oral solution (5 mg/5 mL) prior to the expiration of the ’502 Patent. Appx2007-2008. ANDA No. 214445 includes a Paragraph IV

[1] This brief will refer to the generic version of baclofen oral solution 5mg/5mL that is the subject of Rubicon’s ANDA No. 214445 as the “Defendant’s Product.”

Certification that the claims of the '502 Patent are invalid, unenforceable, and/or not infringed. *Id.*

On October 29, 2021, and in view of the 45-day timeline to file a complaint imposed by 21 U.S.C. § 355 and the assertions in the Notice Letter, Metacel filed its complaint in district court for patent infringement against Rubicon. Appx38-47. Metacel alleged that Rubicon's submission and request for approval of a generic product in ANDA No. 214445 infringed, literally or under the doctrine of equivalents, claims 1 and 2 of the '502 Patent under 35 U.S.C. § 271(e)(2)(A).[2] Appx42. Metacel also alleged that if approved by FDA and marketed, Defendant's Product would infringe, literally or under the doctrine of equivalents, the '502 Patent because physicians, pharmacists, and/or patients would directly infringe the claims and Rubicon would be an indirect infringer by inducement or contributory infringement due to Rubicon's direction

[2] The statute provides that: "It shall be an act of infringement to submit --
(A) an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act or described in section 505(b)(2) of such Act for a drug claimed in a patent or the use of which is claimed in a patent, …
if the purpose of such submission is to obtain approval under such Act to engage in the commercial manufacture, use, or sale of a drug, veterinary biological product, or biological product claimed in a patent or the use of which is claimed in a patent before the expiration of such patent."

and/or inducement of each and every step of claims 1 and 2 of the '502 Patent. Appx42-43.

## II. The Importance of the '502 Patent's Claimed Storage Condition

Claim 1 of the '502 Patent contains limitations directed to four general concepts:

(1) a method for administering a composition containing the active pharmaceutical ingredient "baclofen" for reducing spasticity in a subject;

(2) including a buffer in the baclofen composition;

(3) testing of an impurity in the baclofen composition; and

(4) the storage conditions of the baclofen composition at from about 2°C to about 8°C ("the Storage Limitation").

The district court's finding of summary judgment in favor of Rubicon hinged solely on the analysis of the storage limitation. Yet Rubicon's contentions about the storage limitation—supported only by attorney argument—did not arise until summary judgment briefing. Rubicon's Notice Letter based its non-infringement positions on the assertions that Rubicon did not include a [redacted] and that Rubicon did not test for the [redacted] recited in claim 1. Appx6014-6019. Rubicon's Notice Letter did not include any reference to the Storage Limitation. Appx6289-

6297.

## III. Rubicon's Non-Infringement Contentions

Rubicon did not disclose its storage limitation argument in its Non-Infringement Contentions that it served on Metacel. Appx572-595. New Jersey Local Patent Rule 3.6(e) mandates that the accused party identify its non-infringement positions with adequate particularity by requiring that the accused party identify "[t]he written basis for its Non-Infringement Contentions and Responses."

In fact, Rubicon's discussion of the bases for non-infringement did not reference the storage limitation at all:

> Rubicon's master formula card and manufacturing steps are fully disclosed and described in RUB000673 – RUB000720). Rubicon's Pharmaceutical Development Report is fully disclosed and described in RUB000550 – RUB000632. As set forth in Rubicon's ANDA, Rubicon's ANDA Product does not contain a chemical or any combination thereof. Further, Rubicon's ANDA Product is not tested for the element described in the '502 patent, as that element arises only with the use of a chemical as described by the specification of the '502 patent.

Appx588.

Rubicon's Non-Infringement Contentions then presented its claim interpretation, whereby Rubicon characterized the storage limitation as "storage of the oral solution in a temperature-controlled environment,"

but it did not explain the purported distinction between a "temperature-controlled environment" and the claimed range of from about 2°C to about 8°C:

> There are 3 action steps required by claim 1, in a particular specified order: (1) determination of the amount of the Claimed Impurity in the oral solution; (2) storage of the oral solution in a temperature-controlled environment; and (3) administering an effective amount of the oral solution.

Appx589.

Rubicon then contended that it was not a direct infringer of the '502 Patent but it did not describe any cognizable basis for non-infringement related to the storage condition:

> There can be no direct infringement of the claims of the '502 patent because Rubicon is not the actor with respect to any of the steps of the method claims of the '502 patent. The claims require administration of the drug product, which is not something Rubicon does. The claims of the '502 patent are directed toward other actors, such as the prescribing physician or the patient in need, with respect to the third step of the claims. The first step (testing for the impurity) is performed by an unknown actor, but not Rubicon. The second step (storage of the oral solution) is performed by either the pharmacist or another unknown actor, but not Rubicon.
>
> Moreover, as set forth herein, administration of Rubicon's ANDA Product does not infringe the claims of the '502 patent because Rubicon's ANDA Product does not contain a [redacted] chemical [redacted] or any combination thereof, which is a non-optional essential element of all of the claims of the '502 patent.
>
> Accordingly, Rubicon does not directly infringe the claims of the '502 patent.

Appx589-590.

Rubicon's position regarding induced infringement included a vague and generic contention that there was no infringement of the '502 due to split actors but did not provide any discussion of the storage limitation:

**CONFIDENTAL MATERIAL OMITTED**

> Rubicon's baclofen oral solution does not indirectly infringe the claims of the '502 patent for several reasons. First, Rubicon's baclofen oral solution does not contain a chemical [redacted] or any combination thereof, which is a non-optional essential element of all of the claims of the '502 patent.
>
> Further, Rubicon's proposed composition is not subjected to a determination of the amount of the Claimed Impurity. According to the specification, the Claimed Impurity arises from a reaction between baclofen and chemical is not present in Rubicon's proposed composition, such that there would be no need for determining whether the Claimed Impurity was present. Such a determination is a non-optional, essential step in the claims of the '502 patent. Accordingly, Rubicon's ANDA could not be found to be infringing any of the claims of the '502 patent.
>
> Finally, there is not a single actor who would perform all of the steps of the claims of the '502 patent such that there can be no inducement or contributory infringement by anyone.

Appx590.

Additionally, Rubicon's claim chart included with its Non-Infringement Contentions did not provide any further detail and simply conclusorily contended that it did not infringe the storage limitation without any rationale or citation to any record evidence:

| | |
|---|---|
| and the oral solution is stored after the determination, but prior to the administration, at from about 2 to about 8° C. | No direct infringement,<br>No indirect infringement due to split actor. |

Appx592.

Although Rubicon eventually based its entire summary judgment position on the storage limitation, that contention was never identified in Rubicon's Non-Infringement Contentions, and Rubicon never amended those contentions nor sought leave to do so.

## IV. Rubicon's Summary Judgment Motion and Rubicon's Corporate Testimony Concerning the Storage Limitation

Rubicon first sought leave to move for summary judgment on July 27, 2022. Appx66-68. When submitting that motion for leave, Rubicon improperly attached a draft motion for summary judgment. Appx148-152. The district court denied Rubicon's motion for leave to file its motion for summary judgment based on Metacel's opposition to that motion, the fact that discovery was ongoing, and due to unresolved claim construction issues. Appx173-174. Rubicon's improperly submitted summary judgment motion was not entered by the district court and therefore never ripe for substantive consideration as being deemed premature by the district court. Following the conclusion of *Markman* briefing and entry of a stipulated claim construction order (Appx514-516), Rubicon filed its motion for summary judgment while fact and expert discovery were ongoing, whereby the time period for discovery remained open pursuant to the district court's scheduling order. Appx518-520.

Following Rubicon's filing of its summary judgment motion, Metacel opposed the filing as violative of New Jersey Local Rule 56.1 for failing to include a Statement of Material Facts Not In Dispute. Appx5947. The district court agreed with Metacel but nonetheless granted leave for Rubicon to file the required statement even though that rule mandates that a "motion for summary judgment unaccompanied by a statement of material facts not in dispute shall be dismissed." N.J. Loc. Rul. 56.1; Appx804-815; Appx6011 n.2. After the district court's grant of relief in favor Rubicon, Rubicon's Statement of Material Facts Not In Dispute did nothing more than replicate the argumentative and unsupported facts in Rubicon's motion itself. Appx804-815; Appx526-568. When filing its opposition to Rubicon's motion for summary judgment, Metacel filed its Responsive Statement of Material Facts that identified many genuine issues of material fact, including disputes related to the storage limitation. Appx817-842.

Metacel opposed all the arguments presented in Rubicon's motion for summary judgment and responded as sufficiently as it could to Rubicon's vague argument about the Storage Limitation, which Rubicon

relegated to a single paragraph that did nothing more than summarily conclude that Rubicon did not infringe that limitation:

> Second, Rubicon's ANDA product label calls for temperature storage, and only permits storage in refrigerated conditions. *See* RUB00083 and RUB00087 at **Exhibit 4**. In Metacel's Infringement Contentions, Metacel references RUB00087 for the proposition that "Rubicon discloses that the oral baclofen is stored at 2-8° C". That is the only reference Metacel makes in alleged satisfaction of this claim element. But RUB00087 does not direct storage at 2-8° C, but instead directs storage at temperature and permits refrigerated storage. This is legally insufficient to satisfy the legal requirements for indirect infringement. *See HZNP; Warner-Lambert* authorities cited above.

Appx559.

Rubicon's argument in that sole paragraph hinged its storage limitation assertions on only two pages of its ANDA-filing (RUB00083 and RUB00087, Appx1876 and Appx1880, respectively) that purportedly offered the option for users to store the accused product at temperature temperature

But Rubicon's lone paragraph arguing about its infringement of the storage limitation did not explain how a downstream user would view the purported "permissive" options presented on its label, why Rubicon would list both conditions at all rather than only listing the [redacted]

**CONFIDENTAL MATERIAL OMITTED**

temperature storage condition, and did not address its responses to FDA stating a preference to store Defendant's Product at 2 to 8°C. Appx1984-1985. Specifically, when asked by FDA "[h]ow does your storage temperature statement compare with the storage temperature of [Metacel's Reference Listed Drug] and [the United States Pharmacopeia] (if applicable)?," Rubicon responded that its product would preferentially be stored under the same conditions recited in claim of the '502 Patent, i.e., at 2 to 8°C:

There is no difference in storage temperature statement compare to the RLD.

| RLD's Storage Statement | USP Storage Statement, if applicable | temperature |
|---|---|---|
| Must be refrigerated. Store at 2°C to 8°C (36°F to 46°F). | Not Applicable | [redacted] |

Appx1985.

After Rubicon filed its motion for summary judgment, but before Metacel filed its opposition brief, Metacel deposed two Rubicon corporate witnesses under Rule 30(b)(6) of the Federal Rules of Civil Procedure (APPX): Dr. Gadkari on March 2, 2023 and Dr. Bharati on March 3, 2023.

Counsel for Metacel asked Dr. Gadkari how an end-user would store Rubicon's product in view of the label statement:

> A: Could you repeat the question?
> Q: Yes. How would an end user view Rubicon's storage statement instructing the user to store the ANDA product at 2 degrees to 8 degrees Celsius?
> Mr. Barry: Same Objection; also calls for an opinion.
> A: Well, I'm not aware. I'm not aware about that.

Appx5761-5762 at 192:18-193:9.

Although Dr. Gadkari was unable to answer how a downstream user would store the accused product and Rubicon's counsel objected to this question as one requiring expert opinion, Dr. Gadkari explained that Rubicon informed FDA that the accused product would be stored in the manner claimed by the '502 Patent pursuant to FDA regulations:

> Q: And the Rubicon storage statement says, store at 2 degrees to 8 degrees Celsius. What does that mean?
> A: So Rubicon's product can be stored, if you read the next statement, it says it can be stored at temperature [redacted] and then stored at 2 to 8 degrees, this is as per the FDA's recommendation because FDA wants you to have the same storage conditions as that of [Metacel's approved drug], but in – in the case of Rubicon's product, the Rubicon's product is stable at temperature [redacted] is as per the USP definition, but store at 2 to 8 degrees is as per the requirement of the FDA.
> Q: Is it an FDA requirement, then, that Rubicon's product would be stored at 2 degrees to 8 degrees Celsius?
> A: Yes, it's an FDA's requirement. In addition to storage, a condition of temperature [redacted], a statement stating

> that the product can also be – can also be stored at 2 to 8 degrees, should be there in the – (Reporter interruption.)…

Appx5757-5758 at 188:5-189:2.

Accordingly, Dr. Gadkari testified that Defendant's Product would be stored at 2 to 8°C.

## V. Due to the District Court's Scheduling Order, The Bulk of Expert Discovery was Conducted After Summary Judgment Briefing and Could Not Have Been Considered by the District Court in Rendering its Order Granting Summary Judgment in Favor of Rubicon

It is important to address the effect the summary judgment briefing timeline had relative to the overlapping expert discovery schedule defined by the Scheduling Order, which aligned as follows:




Appx6038.

Indeed, to the extent that Metacel could be considered to be on notice of Rubicon's argument about the storage limitation, the earliest Metacel could have been on notice would have been as of the date of the filing of Rubicon's summary judgment brief, which was only a few weeks prior to the date by which Metacel was to serve its expert's opening report—a report that was premised on the issues presented in Rubicon's Non-Infringement Contentions. Appx546; Appx559; Appx572-595. Rubicon's expert report was not served until after the conclusion of summary judgment briefing. Further, expert opinions in this case were never tested via deposition because the district court rendered its decision on summary judgment prior to the close of expert discovery and without weighing the relative merits of those opinions. Appx6038; *see also* Appx6011-6019. So, ripe factual issues were in dispute during the entire pendency of summary judgment briefing, and remain in dispute because the district court granted summary judgment while discovery was ongoing.

## VI. The Competing Expert Opinions and Unrebutted Opinion of Metacel's Expert Regarding the Storage Limitation

Metacel's expert, Dr. Savello, a licensed pharmacist, opined that a downstream user would store the accused product at 2°C to 8°C due to

the statements made in Rubicon's ANDA and in his consideration of the contents of the ANDA. Appx5925-5926 ¶¶ 91-92. After Dr. Savello served his opening report on March 17, 2023, Rubicon filed its summary judgment reply brief on April 5, 2023, followed by Rubicon's service of its expert's report on April 17, 2023.

Rubicon then presented attorney argument about the storage limitation for the first time in its reply brief in support of its summary judgment motion, where Rubicon posited that the determination of whether it induces infringement of the storage limitation should be based solely on the "boxed label or the package insert label…which itself does not contain sufficient information to rise to induced infringement even if it did represent an instruction to the downstream user which it facially does not." Appx5978. In support of this nascent argument, Rubicon served the report of its expert, Dr. Barrett Rabinow, an organic chemist specializing in "R&D, analytical, formulation, manufacturing, regulatory, quality, and patent issues, with an emphasis on sterile injectable dosage forms," which included analytical work related to pharmaceutical products, but no identified experience as a physician or pharmacist. Appx6433 ¶¶ 5-6; *see also* Appx6433-6437 ¶¶ 5-18 generally.

Thus, for the first time, Metacel was conceivably on notice of the factual basis of Rubicon's arguments concerning the storage limitation as of the date of the service of Rubicon's expert report.

While Dr. Rabinow's rebuttal report purported to support Rubicon's storage limitation argument—i.e., the argument that an end user would look only to the accused product's label and then ignore the instruction to store the accused product as provided by the storage limitation—Dr. Rabinow's report presented conflicting rationales, cited inapt studies, and provided reasons why a pharmacists or end-user would actually prefer to store the accused product under refrigerated conditions (2 to 8°C). *See* Appx6486-6495 ¶¶197-227; *see also See* Appx6552-6560 ¶¶124-151. Dr. Savello responded to all of these issues in turn in his reply report where he further explained why a real-life end-user would store Rubicon's generic drug product as specified by the storage limitation. *See* Appx6552-6560 ¶¶124-151.

One aspect of Rubicon's ANDA and Dr. Rabinow's report was the treatment of the storage statement Rubicon made to the FDA, whereby Rubicon told the FDA that its product would be stored at 2 to 8°C, which Dr. Savello cited in his report and Metacel identified in its Infringement

Contentions. *See* Appx5925-5926 ¶¶ 91-92; *see also* Appx6306-6307. But in an effort to refute the veracity of Rubicon's own representations made to FDA, Dr. Rabinow discussed Rubicon's response to FDA's question: "[h]ow does your storage temperature statement compare with the storage temperature of [Metacel's Reference Listed Drug] and [the United States Pharmacopeia] (if applicable)?" Appx6487-6488 ¶¶ 203-206; *see also* Appx1984-1985. Dr. Rabinow opined that "Rubicon responded <u>by minimizing discussion of this issue with the agency</u>," (emphasis added). Appx6488 ¶¶ 205-206. Thus, according to Dr. Rabinow, Rubicon sidestepped FDA's question so that it could "emphasize[] the advantageous storage conditions temperature rather than accurately portray the circumstances surrounding how Rubicon's accused product would actually be stored by downstream users. Appx6489 ¶ 208. But Dr. Rabinow did not refute that Rubicon made this statement to FDA, did not contend this statement was incorrect or made in error, or explain what weight FDA may give to this statement or how this statement would relate to how a real-world user would store Rubicon's generic drug product or whether FDA would approve Rubicon's generic drug submission when the proposed label contained opposing

storage instructions compared to the representations made to FDA when asked about how the product was to be stored. Dr. Rabinow also opined that [redacted] and refrigerated conditions (2 to 8°C) were "opposite" conditions but did not explain his rationale given that both conditions are temperature-controlled environments (*See* Appx6490 ¶ 215; *see also* Appx6552-6555 ¶¶ 126-133). Dr. Rabinow's assertion that refrigerated and [redacted] storage are "opposite" storage conditions is a confounding issue given Rubicon's characterization of the Storage Limitation in its Non-Infringement Contentions as storage in "a temperature-controlled environment." Appx589. In fact, Dr. Rabinow's failure to squarely address the implications of the storage statement and explain his conflicting rationales evidence the existence of genuine issues of material fact that remain unresolved.

Nevertheless, setting aside the questionable reliability of Dr. Rabinow's opinion regarding the storage statement, Dr. Savello was equipped to expound on his consideration of the storage limitation once Rubicon had presented a complete argument on this issue. At that point, further informed by his experience as a pharmacist, Dr. Savello opined that he believed that real-life downstream practitioners would store the accused product at 2°C to 8° in view of the label's stated storage conditions:

> Indeed, when viewing Defendant's Product label without more information, I may question which conditions to store Defendant's Product given the "opposite" storage conditions listed on Defendant's Product label. As a pharmacist, I have never seen a drug label that explicitly lists "opposite" storage conditions, i.e., refrigerated and temperature storage, as Defendant's product label does. (Savello Report, Ex. F at RUB000087). Lacking clear guidance from Defendant's Product label, as a pharmacists, I would defer to the storage instructions for the reference listed drug ("RLD"), and store Defendant's Product consistent with the RLD's storage instructions, or simply default to refrigerated conditions over temperature storage due to the benefits of refrigeration. Here, the RLD is OZOBAX®. Regarding storage, the label of OZOBAX® states: "[m]ust be refrigerated. Store at 2°C – 8°C (36°F – 46°F)." (*Id.*). Accordingly, as a pharmacists, I would store Defendant's Product in a refrigerator, i.e., at 2-8°C, consistent with the label of OZOBAX®. Thus, because[sic] Defendant's Product label instructs an end-user, e.g., a pharmacist to store Defendant's Product at 2-8°C.

Appx6553 ¶ 127.

Notably, Dr. Savello's expert opinion on this issue remains unrebutted and unresolved because the district court did not address the substance of Dr. Savello's opinion.

## VII. The District Court's Order on Summary Judgment

As noted above, summary judgment briefing concluded while expert discovery was ongoing. Appx173-174; Appx518-520. This overlapping timeline arose due to Rubicon's decision to seek early summary judgment while the parties adhered to the district court's scheduling order. Appx60-64. Notably, the parties never amended or delayed the deadlines set by the district court as those related to the conclusion of expert discovery. *Id.* And the relation of the timelines of summary judgment briefing and expert discovery meant that the parties—and non-movant Metacel in particular—would not have been able to fully present its factual bases for infringement while also adhering to the district court's briefing schedule.

The district court thus based its opinion on the attorney arguments presented in Rubicon's motion for summary judgment, finding, among other things, that summary judgment in favor of Rubicon was warranted because "Metacel's opposition comprises essentially one portion of one

application page relating to refrigeration of Rubicon's Generic (and thus to Metacel's Fridge Claims)." Appx6016-6017. Although the district court did not acknowledge that Metacel could neither respond to a complete argument about the storage limitation until Rubicon filed its reply brief nor rebut facts surrounding the issue because Rubicon's expert had yet to file his report, the district court acknowledged that Rubicon's storage limitation argument was finally articulated in Rubicon's reply brief, saying "as Rubicon argues in reply, infringement will not occur because downstream users will read and follow the label, not the ANDA paperwork." Appx6018. Indeed, notwithstanding whether the district court's finding was supported by facts in the record or the law, the district court also had to look to Rubicon's reply brief when identifying the sole argument upon which it based its order.

Metacel attempted to notify the district court in its opposition to summary judgment that discovery was incomplete and that Metacel reserved its rights to supplement, modify, or amend its arguments following completion of discovery and that Metacel should not be prejudiced by the overlap of ongoing discovery under the Scheduling Order and Rubicon's choice to move for summary judgment at its chosen

time. Appx5947 n.4. However, the district court disregarded the prejudice of those circumstances and granted summary judgment by concluding that "Metacel's entire argument is that a genuine issue of material fact exists because 'at least two express statements in Rubicon's ANDA contradict that argument'…". Appx6016. The district court then based its entire opinion on its interpretation of how a user viewing Rubicon's generic product label would store Defendant's Product without any findings of fact. Appx6016-6017. The district court also gave no weight to Metacel's assertions because "nothing in the record suggests that the downstream user will ever see the Storage Statement's refrigeration requirement, undermining any argument that infringement would ever be induced." Appx6017. But the district court's finding about who might see the Storage Statement, whether Rubicon may instruct users in accord with that Storage Statement, and whether a user would store Defendant's Product at 2°C to 8°C was never proven by Rubicon even though it was the party that bore the burden on summary judgment.

Further, to the extent that the record was not complete enough to establish Metacel's showing of genuine issues of material fact, this was

simply due to the district court granting summary judgment while the record was still being developed as the parties adhered to the Scheduling Order that set the conclusion of expert discovery well after the district court's Summary Judgment Order. Appx60-64; Appx6038. Thus, in view of the district court granting summary judgment in favor of Rubicon without a complete factual record, Metacel filed a motion for reconsideration asking the district court to consider the full expert reports and disputes of material fact identified by Metacel. Appx6049-6050; Appx6028-6047.

## VIII. The District Court's Order on Metacel's Motion for Reconsideration

After the district court granted summary judgment on Rubicon's motion, Metacel timely sought reconsideration on the bases that Rubicon's presentation of its storage limitation argument was untimely and in contravention of New Jersey's local rules and that the district court overlooked the facts presented during expert discovery. Appx6028-6047. When denying Metacel's motion for reconsideration, the district court repeated certain findings from its order on summary judgment and presented three findings, which Metacel seeks to overturn here.

First, the district court disagreed with Metacel's argument that it was not placed on adequate notice of the Rubicon's storage limitation. Appx6034-6038; Appx7-9. In response to this argument, the district court found that "Metacel cannot reasonably argue that it was not placed on notice of Rubicon's intent to present its [storage limitation] theory on summary judgment" because "Rubicon's April 20, 2022 non-infringement positions explicitly stated that its ANDA did not directly infringe the [storage limitation's] language even though Rubicon's Non-Infringement Contentions stated nothing more than "No direct infringement, No indirect infringement due to split actor." Appx7-9; Appx592. The district court also referenced Rubicon's improperly filed summary judgment brief that was not entered by the district court, which summarily contended that "Rubicon intended to assert that its ANDA did not directly infringe the [storage limitation]," thereby purportedly placing Metacel on notice of Rubicon's full argument as ultimately reflected in its reply brief for summary judgment. Appx8. The district court further explained that Metacel was uniquely placed on notice in this case as compared to other patent infringement cases because this case is differentiated "from cases in which courts have found more complex non-infringement arguments

untimely, including this Court's own determination in *Janssen Pharms., Inc. v. Mylan Lab'ys Ltd.*, No. 20-CV-13103, 2023 WL 3605733 (D.N.J. May 23, 2023)." *Id.* Yet the district court did not explain how this case was simpler than other patent cases or—to the extent that conclusion was accurate—how a case's simplicity justifies one party's circumvention of the local rules and the Federal Rules of Civil Procedure.

Second, the district court declined to afford any weight to the expert opinions concerning how practitioners (e.g., physicians, pharmacists, patients) would store the accused product in view of the label and surrounding information. Appx10-11. The district court did not appear to give any consideration to Rubicon's expert's opinion that Rubicon had "minimized discussion" with FDA about the Storage Limitation when corresponding with the agency, but rather, the analysis of the storage conditions rests on "the plain text of the ANDA label." *Id.* Conversely, the district court did not consider Metacel's expert's well-reasoned analysis that end-users would likely refrigerate Defendant's Product in view of the product label's stated storage conditions.

Third, the district court stated that "Rubicon's submission noted the differences between the RLD's storage statement and its ANDA; the

submission informs the FDA that ANDA's refrigeration *temperature* is identical to the RLD's *when refrigerating*, but that the refrigeration *requirement* is not, and explains why," pointing to the "Justification of Differences" contained in Rubicon's storage statement. (emphasis in original). *Id.* This statement, while unclear, appears to be an instance of the district court engaging in its own fact-finding over a factual dispute never raised by the parties and acknowledges that downstream users will store the accused product at 2°C to 8°C "*when refrigerating*." *Id.* Following denial of Metacel's motion for reconsideration, Metacel timely sought appeal in this Court.

## SUMMARY OF ARGUMENT

The district court granted summary judgment in favor of Rubicon, which was improper for three reasons. First, the district court erred by basing its entire infringement analysis on the proposed label of Rubicon's generic drug product when it should have considered surrounding factual evidence and relevant case law. Controlling case law proscribes that a district court must consider facts beyond the mere statements of the label, including expert opinion and surrounding circumstantial evidence. Second, the district court erred by overlooking that Metacel's expert

opined that users of Defendant's Product would be induced to store the product at 2 to 8°C, thereby practicing the storage limitation. Here, on at least this basis, the record before this Court demonstrates that summary judgment was improper because genuine issues of material fact remain at issue. And by requiring Metacel to disprove Rubicon's attorney argument that was unsupported by any expert evidence, improperly flipped the burden onto non-movant Metacel. Third, it was improper for the district court to rely on a non-infringement theory that Rubicon did not identify in its Non-Infringement Contentions and for which Rubicon first presented in its summary judgment reply. Rubicon never sought relief from the district court to amend its Non-Infringement Contentions or its discovery responses to timely elucidate its argument and the district court's grant of summary judgment while disregarding the local rules and the Federal Rules of Civil Procedure should be overturned as arbitrary and capricious.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment under the law of the regional circuit, here the Third Circuit. *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1358 (Fed.Cir.2011). The Third

Circuit reviews the grant of summary judgment *de novo*. *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir.2000) (en banc). Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). At the summary judgment stage, this Court credits all of the nonmovant's evidence and draw all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In doing so, the Court's function is not to "weigh the evidence and determine the truth of the matter" but instead to determine whether there is a genuine issue for trial. *Id.* at 249.

Regarding this Court's review of the district court's treatment of local patent rules, "issues concerning the validity and interpretation of [local patent] rules are 'intimately involved in the substance of enforcement of the patent right,' … and must be governed by the law of this circuit." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1364 (Fed. Cir. 2006) (internal citations omitted). This Court can assess the propriety of the district court's application of local patent rules under the law of this Court and "'[d]ecisions enforcing local rules in patent cases will be affirmed unless clearly unreasonable, arbitrary, or

fanciful; based on erroneous conclusions of law; clearly erroneous; or unsupported by any evidence.'" *Shire LLC v. Amneal Pharms., LLC*, 802 F.3d 1301, 1306 (Fed. Cir. 2015) (quoting *O2 Micro.*, 467 F.3d at 1366–67).

## ARGUMENT

This case arises from the Hatch-Waxman Act, which is a provision of the Drug Price Competition and Patent Term Restoration Act of 1985. Pub. L. No. 98-417, 98 Stat. 1585 (1984); 21 U.S.C. § 355 and 35 U.S.C. § 271. Under the Hatch-Waxman Act, a manufacturer wishing to market a new prescription drug must submit a new drug application ("NDA") to FDA and undergo a lengthy and costly testing process, after which, if successful, the manufacturer will receive marketing approval from FDA. *FTC v. Actavis, Inc.*, 570 U.S. 136, 142-43 (2013); *see* 21 U.S.C. § 355(b)(1).

Once FDA has approved a brand-name drug for marketing, the Hatch-Waxman Act permits a manufacturer of a generic drug to obtain similar marketing approval, by filing an abbreviated new drug application ("ANDA"), by which the generic manufacturer may rely on the studies conducted by the brand-name drug manufacturer, thus

making it significantly cheaper and easier for the generic drug to enter the market. *Actavis*, 570 U.S. at 142-43 (by allowing the generic to piggy-back on the pioneer's approval efforts, the Hatch-Waxman Act speeds the introduction of low-cost generic drugs to market, thereby furthering drug competition). However, prior to the generic drug being approved for the market, the generic drug manufacturer must assure the FDA that the generic drug will not infringe on the brand-name drug's active patents. *Id.* One such way the generic drug manufacturer can provide this assurance is by certifying that any listed or relevant patent will not be infringed by the manufacture, use, or sale of the generic drug described in the ANDA ("Paragraph IV certification"). The filing of an ANDA with a Paragraph IV certification is automatically treated as an act of infringement under § 271(e)(2)(A), giving the brand-name manufacturer the right to commence litigation before the actual sale of the generic drug has occurred. *See* § 355(j)(2)(A)(vii)(IV); 35 U.S.C. § 271(e)(2)(A); *Vanda Pharm. Inc. v. W.-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1129 (Fed. Cir. 2018). Based on the foregoing, Rubicon opted to file its ANDA with a Paragraph IV certification, and on October 29, 2021, Metacel timely filed suit against Rubicon.

As discussed above (*supra*, at 16, 23, 25), the district court ultimately granted summary judgment in favor of Rubicon, which was improper for three reasons. First, the district court erred by basing its entire infringement analysis on the proposed label of Appellee's generic drug product, while ignoring relevant precedent and surrounding evidence that contradicted that storage statement. Second, the district court erred by overlooking that Metacel's expert opined that users of Appellee's generic drug product would be induced to store the product at 2 to 8°C, thereby practicing the storage limitation. Third, it was improper for the district court to rely on a non-infringement theory that Appellee did not identify in its non-infringement contentions and for which Appellee never sought relief from the district court to amend.

## I. The District Court Erred by Relying Soley on the Explicit Text of the ANDA Product Label and Failing to Consider the Surrounding Relevant Circumstantial Evidence

In its Memorandum Order denying Metacel's Motion for Reconsideration for Summary Judgment, the district court held that when determining whether an ANDA would induce infringement, courts are to look solely at the four-corners of the ANDA product label and

nothing else. Appx12-13. This holding contradicts the precedent of this Court.

To prove a claim of induced infringement, it must be established that the generic drug manufacturer possessed the specific intent to encourage another's infringement. *Vanda Pharm*, 887 F.3d at 1129 (Fed. Cir. 2018). Specific intent may be shown by demonstrating the ANDA product label in consideration of surrounding evidence "encourages, recommends, or promotes infringement" which may be shown by the words of the label itself *or* the introduction of relevant circumstantial evidence. *Id* at 1133; *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed.Cir.1988) ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.").

This Court has long "endorsed the district court's reference to relevant evidence" outside of the ANDA product label. *Ferring B.V. v. Watson Labs., Inc.-Florida*, 764 F.3d 1401, 1408 (Fed. Cir. 2014)(an "infringement determination is ... based on consideration of all the relevant evidence" in conjunction with the ANDA itself); as reaffirmed in *Vanda Pharm*, 887 F.3d at 1129; *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010) (to "the extent that [Appellee] contends that

such circumstantial evidence cannot support a finding of specific intent, this court has explicitly stated otherwise."). And while this Court has decided cases based on the label alone, it has done so when no other evidence was presented related to whether the ANDA product label unambiguously infringed or did not infringe. *HZNP Medicines LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 699 (Fed. Cir. 2019) ("Horizon's *only* evidence of inducement depends upon Actavis's label").

In this case, the district court applied the holding of *HZNP* too narrowly and ignored other relevant precedent when it concluded that no fact-finding was needed to understand how a downstream user, such as a pharmacist, doctor, or patient would store Rubicon's generic drug product in view of the label. In fact, most recently, in *Glaxosmithkline LLC v. Teva Pharms. USA, Inc.*, 7 F. 4th 1320 (Fed. Cir. 2021) ("*Glaxo*"), when holding that appellee's ANDA's product label induced infringement of the branded patent, this Court distinguished its holding from that in *HZNP* appellants in the *Glaxo* case presented "substantial evidence" to support the determination that the ANDA product label contained information encouraging infringement of the patented drug, thus, once again, demonstrating that extrinsic evidence may be considered in

induced infringement cases. *Glaxo* at 1329 (further explaining that the jury is entitled to rely upon expert testimony describing how a downstream user would view the entirety of a product label and "reject the argument that certain portions of the label were disjointed from others").

Here, the district court refused to substantively consider Metacel's expert's opinion even though he provided a plausible in-depth explanation why a downstream user such as a pharmacist, physician, or patient would store the generic drug product at 2 to 8°C. Appx6553 ¶ 127; Appx6555 ¶¶ 132-133; *Amarin Pharma, Inc. v. W.-Ward Pharms. Int'l Ltd.*, 407 F. Supp. 3d 1103, 1112 (D. Nev. 2019) (Differentiating *HZNP* because the expert in *HZNP* "provided an implausible interpretation of the labelling in an attempt to show induced infringement of the asserted patent claims, whereas here, Plaintiffs' expert testimony offers a plausible interpretation of the labelling that suggests the Court could find induced infringement."). By restricting its analysis to only the ANDA product label and refusing to consider any additional evidence presented by Metacel, the district court disregarded relevant precedent and improperly applied *HZNP*.

Further, regarding its opinion, the district court improperly shifted the burden of summary judgment on non-movant Metacel by forcing Metacel to disprove a theory Rubicon presented for the first time during summary judgment and for which expert discovery had not proceeded to elucidate all the relevant facts. *HZNP*, 940 F.3d at 699 ("The nonmovant's evidence is to be believed and all justifiable inferences are to be drawn in his favor."). Yet because the district court improperly granted summary judgment well before expert discovery had completed under the district court's Scheduling Order, there were no findings of fact related to Dr. Savello's opinion. And Rubicon's motion for summary judgment was unsupported by anything other than attorney argument. Accordingly, given the totality of the circumstances arising from overlapping discovery and summary judgment briefing schedules, the district court's misapplication of this Court's precedent, the burden-shifting onto non-movant Metacel, and the district court's unwillingness to consider the facts and resulting genuine issues of material fact (explained further *infra* at 36-43), this Court should overturn the district court's finding of summary judgment in favor of Rubicon.

## II. Summary Judgment was Inappropriate Because There Were Genuine Issues of Material Fact as to whether Appellee's ANDA Induces Downstream Users to Infringe the Storage Limitation.

Summary judgment is only appropriate where there are no genuine issues of material fact, such that, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The moving party must support its motion by citing to specific materials on the record. Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has adequately supported its motion, the burden shifts to the nonmoving party that must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. And the Court "may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Id.* at 255 (emphasis added); *Watts v. Univ.*

*of Delaware*, 622 F.2d 47, 50 (3d Cir. 1980)("issues of intent are not well suited to disposition by summary judgment").

Here, Rubicon's ANDA infringes on the '502 Patent by encouraging downstream users, such as physicians or pharmacists, to store Rubicon's generic product in temperatures of about two to eight degrees Celsius. Metacel's infringement contentions identified that Rubicon represented to FDA that Defendant's Product should be stored "at 2-8°C." Appx6306-6304. While Rubicon's proposed but unapproved ANDA product label purportedly also permits storage of the oral solution at temperature [redacted] unrebutted expert opinion from Metacel's expert, Dr. Savello (a licensed pharmacist), explained that he has never before seen a product label bearing two different conflicting storage conditions, so if he were viewing that label in a pharmacy, he would be likely to store that product at 2-8°C due to multiple reasons, including congruity with the reference product (Metacel's product), limited disruption to patients switching to a generic, and improved taste via refrigeration. *Supra* at 19; Appx6552-6555 ¶¶ 126-133; Appx6054-6056 ¶¶8-10.

Notwithstanding Dr. Savello's unrebutted opinion that should have been treated as true by the district court under summary judgment, this

Court has held that "even if the proposed ANDA product has substantial non-infringing uses, [the ANDA applicant] may still be held liable for induced infringement" where it recommends the infringing acts. *Vanda Pharm.*, 887 F.3d at 1129; *Janssen Pharm., Inc. v. Mylan Labs. Ltd.*, 20-CV-13103 (EP) (LDW), 2023 WL 3605733, at *15 (D.N.J. May 23, 2023) (stating that "[t]here is no legal or logical basis for limiting induced infringement liability where the proposed label has substantial noninfringing uses").

It is indisputable that Rubicon's ANDA label contains instructions on how to engage in an infringing use (i.e., the storage limitation), and, as the Supreme Court of the United States has explained, "[e]vidence of active steps ... taken to encourage direct infringement, such as advertising an infringing use *or instructing how to engage in an infringing use*, show an affirmative intent that the product be used to infringe." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 915, 125 S. Ct. 2764, 2768, 162 L. Ed. 2d 781 (2005)(emphasis added); *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1059 (Fed. Cir. 2010)(applying the Supreme Court's holding in Metro-Goldwyn-Mayer to a drug infringement case). While the factual evidence presented by non-

movant Metacel could likely establish a finding that Rubicon would induce infringement of the ’502 Patent, the circumstances should at the very least have established a genuine of material fact thereby resulting in denial of Rubicon’s summary judgment motion.

The existence of genuine issues of material fact are evidenced for least two reasons. First, not only does Rubicon’s product label contemplate refrigeration but when asked by the FDA how Appellee intended to store its generic version of Metacel’s drug, Rubicon represented to the FDA that “[t]here is no difference in storage temperature statement compare (sic) to [Metacel’s drug].” Appx6016. When opining about Rubicon’s representations to the FDA regarding refrigeration of the ANDA product, Rubicon’s own expert stated “[Appellee] responded by minimizing the discussion of this issue with the agency … [h]owever, this is not what appears in the labeling.” Appx6488 ¶¶ 205-206. Further, Dr. Gadkari, a Rule 30(b)(6) witness for Rubicon testified that it would be an “FDA requirement” that Rubicon’s product be stored at 2-8°C. Appx5757-5758 at 188:5-189:2. Rubicon’s (i) representations to the FDA that its generic product will be refrigerated exactly like Metacel’s drug; (ii) its expert’s own assertions that Rubicon

**CONFIDENTAL MATERIAL OMITTED**

was less than forthright to FDA about its true intentions for storage of its generic drug; and (iii) the fact that its product label provides two customarily incompatible storage solutions, creates a genuine issue of material fact as to what Rubicon's true intentions are in respect to the storage limitation and how it will market Defendant's Product.

Second, Metacel presented uncontested expert testimony that a pharmacist, after reading Rubicon's ANDA product label, which explicitly lists two contradictory storage conditions, would "defer to the storage instructions for the reference listed drug (i.e., Metacel's drug or the RLD), and store [Appellee's generic drug] consistent with the RLD's storage instructions, or simply default to refrigerated conditions over temperature storage due to the benefits of refrigeration." Appx6054-6059 ¶¶ 9-18. In other words, Metacel's expert asserts that Rubicon's label itself would have led a downstream user, such as a pharmacist, to refrigerate Defendant's Product, thus infringing upon the '502 Patent. Nonetheless, the district court gave no weight nor considered the Savello Declaration because the Rubicon's label purportedly "does not lack clear guidance [as] … the label unambiguously instructs users to store [Rubicon's generic drug] at temperature

**CONFIDENTAL MATERIAL OMITTED**

This broad statement by the district court shifts the burden onto non-movant Metacel, disagrees with Metacel's expert without any factual support, and contradicts relevant precedent as set forth above. *See Vanda* 887 F.3d at 433 (court relied on evidence beyond the label about the real world practice of physicians to reach its conclusion that infringement would occur); *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 845 F.3d 1357, 1367 (Fed. Cir. 2017)(holding the "product labeling, combined with the testimony discussed above [about physicians' general practices], provide sufficient evidence that physicians condition premetrexed treatment on [the patient's performance of the patented method]").

The evidence presented at summary judgment and later on Metacel's motion for reconsideration once additional facts had entered the record indicate that (a) Rubicon asserted to the FDA that Defendant's Product would be stored exactly the same temperature as the '502 Patent; (b) Rubicon's product label, while purportedly permitting storage at [redacted] temperature also instructs refrigeration of the product; (c) Appellee intentionally minimized its discussions with the FDA regarding how it actually intended to market its storage of Defendant's Product (as disclosed by its own expert witness) in an effort to expedite approval of

Defendant's Product; and (d) Dr. Savello's testimony that when reading the ANDA product label, as a practicing pharmacist, he would refrigerate Defendant's Product created a genuine issue of material fact regarding Appellee's true intent as to the Storage Limitation and how it would eventually market Defendant's Product. The existence of these genuine issues of material fact demonstrate that such summary judgment was inappropriate at the district court.

## III. The District Court Erred by Granting Summary Judgment on an Issue that Appellee Failed to Identify in its Non-Infringement Contentions in Violation of the Local Patent Rules and Federal Rules of Civil Procedure

On April 20, 2022, Rubicon served its Non-Infringement Contentions on Metacel. In Rubicon's Non-Infringement Contentions, when discussing its basis of non-infringement, Rubicon did not mention or make any contention regarding the Storage Limitation. *Supra* at 5-19; Appx572-595. It simply identified the conditions of storage as "a temperature-controlled environment." *Supra* at 5-6; Appx589. The only direct reference to Rubicon's position regarding the storage limitation was its conclusory statement in its claim chart distilled to only ten words without any legal analysis or citation to the record: "no direct infringement, no direct infringement due to split actor." Appx590.

Accordingly, there can be no reasonable basis to believe that Rubicon's Non-Infringement Contentions placed Metacel on notice of the storage limitation Rubicon first presented in its summary judgment reply brief.

On June 6, 2022, Rubicon served its responses and objections to Metacel's first set of interrogatories. Appx6309-6333. Rubicon was asked to explain its basis for non-infringement:

> For each Claim-in-Suit, describe in detail all factual and legal bases for Rubicon's contentions in the Infringement Contentions that and ANDA Product will not infringe a Claim-in-Suit, either literally or under the doctrine of equivalents, including, but not limited to, an identified of each limitation that Rubicon contends is not present in the ANDA Product, and an explanation as to why Rubicon does not actively induce or contribute to the infringement of that claim by others.

Appx6328.

Rubicon objected to this interrogatory as a "premature contention interrogatory." *Id.* Yet there is no rationale to explain how that contention could be premature when Rubicon was required to explain its basis for the Storage Limitation in its Non-Infringement Contentions it served nearly two months earlier under the local rules. Rubicon further objected to this interrogatory on the basis that it was "prematurely seeking information that is in the nature of expert opinion." *Id.* Yet

Rubicon argued to the district court that no expert discovery was necessary for the district court to find in favor of Rubicon in the briefing below. Appx6259. Rubicon should not be able to withhold discoverable information on the basis that the requests were premature or subject to expert opinion on the one hand, while later premising its entire case on the very same information it never disclosed (i.e. the storage limitation) and vehemently arguing expert discovery was not required to determine non-infringement of the same. Appx6255-6260.

## IV. Appellee's Failure to Provide Discovery on the Storage Limitation as Required Under the Federal Rules of Civil Procedure Barred Appellee from Using that Same Information as Evidence in its Motion for Summary Judgment.

Appellee failed to satisfy the Federal Rules of Civil Procedure by omitting its storage limitation argument from discovery. Rule 26(e)(1) requires that a "party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response." Appellee never supplemented its responses in satisfaction of Rule 26. And Appellee's motion briefing is not a "disclosure" ""made known to [a party] during the discovery process."' *Par Pharm., Inc v. QuVa Pharma, Inc.*,

No. CV 17-6115-BRM-DEA, 2018 WL 949985, at *5 (D.N.J. Feb. 8, 2018). Further, Rule 37(c)(1) provides that a party's failure to provide information under Rule 26(a) or (e) means that "the party is not allowed to use that information or witness to supply evidence on a motion…unless the failure was substantially justified or harmless." *See Seahorse Oceanside Apartments Condo. Ass'n, Inc. v. Homesite Ins. Co.*, 446 F. Supp. 3d 1097, 1106 (S.D. Fla. 2020), as amended (Mar. 13, 2020) (because Appellee "failed to provide information as required by Rule 26(a) or (e), [Appellee] is not allowed to use that information to supply evidence on a [summary judgment motion]"); *Cunningham v. Fulton Cty., Georgia*, 785 F. App'x 798, 803-04 (11th Cir. 2019) (affirming exclusion of evidence where defendants "didn't list these documents as part of their initial disclosures or supplement their disclosures thereafter. And, importantly, the district court found that the employees didn't give any explanation for their failure to disclose").

Appellee never supplemented its contentions or discovery responses to include the storage limitation argument in satisfaction of Rule 26 and should have been barred from relying on that argument in its motion for summary judgment pursuant to Rule 37. In circumstances similar to the

one here, courts have found that summary judgment should not be granted when the moving party had failed to disclose the non-infringement theories until the filing of the motion because the claim chart contention "requirement was designed to prevent a 'shifting sands' approach to patent litigation. *Tritek Techs., Inc. v. United States*, 63 Fed. Cl. 740, 743 (2005), *affd*, *Tritek Techs., Inc. v. United States*, 208 F. Appx. 869 (Fed. Cir. 2006). Indeed, the contentions should "represent a final commitment to the theories of infringement that would be pursued." *Ibid*. And while Appellee did not amend its Non-Infringement Contentions or its responses to Metacel's discovery requests, that duty remained on Appellee throughout the litigation at the district court. *Id*. at 746 ("By its clear language, [FRCP 26(e)(1)] places a burden on the answering party to supplement an answer to a prior response if it learns that the response, even if correct at the time given, has become incomplete."). Here, Rubicon failed to satisfy its duties under the local rules and the Federal Rules.

FRCP 37(c)(1) restricts the use of material in a motion that was not provided under FRCP 26(a) or (e). *See Tritek*, 63 Fed. Cl. at 750. While Rule 37(c)(1) excuses some delay in providing discoverable information,

it does so only when that delay was "substantially justified or harmless," and Appellee's actions do not meet the Third Circuit's related test:

> When looking at whether a failure to disclose under Rule 37(c)(1) was substantially justified or harmless and determining whether to exclude evidence from trial, the Third Circuit has set forth four factors that the court must consider: "(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation."

*King v. Verizon New Jersey, Inc.*, Civ. No. 21-11226 (RMB/MJS), 2023 WL 5817126, at *9 (D.N.J. Sept. 6, 2023) (quoting *Nicholas v. Penn. State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000)).

Here, all four factors related to Rule 37 weigh in favor of Metacel. First, given that Rubicon's non-infringement theory was not identified until the summary judgment reply and that argument ended up being dispositive in the case, Metacel was surprised by the presentation of this untimely but critical theory. Indeed, Metacel was also sandbagged by having no right to submit a sur-reply without disfavored leave of the district court, combined with the fact that expert discovery did not conclude until months after completion of the summary judgment

briefing. *See Seahorse*, 446 F. Supp. 3d 1097, 1106 (describing the unjust nature of a failure to disclose stating, "in practice, [appellee's] non-disclosure prevented [appellant] from using any of the twenty pages it was allotted for its Motion – and none of the ten pages it was afforded for its Statement of Material Facts – on what has turned out to be the central issue in the case. And so, while [appellee] was able to rely on the [un-disclosed evidence] as the primary thrust of both its [brief] and its Statement of Material Facts, [appellee] was left only a portion of its ten-page Reply").

Second, Rubicon could have easily cured the prejudice by simply seeking to amend its Non-Infringement Contentions or supplement its discovery responses as required under the rules, yet it chose not to do so. Third, Rubicon's untimely disclosure disrupted the flow of the proceeding because the late disclosure of the storage limitation argument greatly impeded discovery on this issue, while discovery was mainly focused on the buffer limitation and the impurity limitation during the majority of the case. *Id.* ("[w]orse, the non-disclosure precluded [appellant] from conducting any discovery on . . . [the non-disclosed evidence]. This is precisely the kind of litigation by surprise that the Federal Rules were

designed, at least in part, to eradicate."). Fourth, it seems evident that Rubicon's concealment of its Storage Limitation argument could have only arisen through bad faith since it must have known early in the case that it intended to advance the Storage Limitation theory, but did not identify that issue in its Notice Letter, its Non-Infringement Contentions, or its discovery responses. Accordingly, analyzing Rule 37(c)(1) further demonstrates that the district court erred in granting summary judgment on Rubicon's untimely argument about the storage limitation.

## V. Appellee's Failure to Identify its Storage Limitation Argument in its Non-Infringement Contentions in Violation of the Local Patent Rules Barred Appellee from Using that Same Information as Evidence in its Motion for Summary Judgment.

Rubicon's conclusory storage limitation contention was improper here because it failed to place Metacel on notice of its theory. Local patent rules exist so that parties may elucidate the issues of infringement and claim construction early in the case. *See Janssen Pharm., Inc. v. Mylan Labs. Ltd.*, 20CV13103 (EP) (LDW), 2023 WL 3605733, (D.N.J. May 23, 2023). This purpose, however, is "undermined when parties are permitted to make initial 'place holder' disclosures regarding

infringement or invalidity, then makes substantial changes or additions to those contentions immediately prior to or after the close of fact discovery." *Graco Children's Products Inc. v. Kids II, Inc.*, 1:13-CV-1183-TWT, 2018 WL 1509192 (N.D. Ga. Mar. 26, 2018). Appellee's contention stated that there was "no direct infringement, no direct infringement due to split actor" gave Metacel no notice or understanding of Rubicon's eventual case-defining argument. Rubicon's dispositive—but incorrect—argument that the generic drug label is the sole piece of evidence to rely upon and the drug label's purportedly "permissive" statements were controlling over contradictory evidence. Appx533; Appx559. Further, Appellee never sought leave from the district court to amend its contentions to include this theory or identify any cause as to why it failed to do so prior to summary judgment briefing.

Rubicon's argument about the Storage Limitation becomes even more problematic when considering that Appellee did not cite any record evidence whatsoever supporting that contention. Appx572-595. Moreover, Rubicon never attempted to explain or cite any record evidence about the purported significance between its representation to the FDA explaining that "[t]here is no difference in storage temperature

statement compare (sic) to [the 502 Patent]" and the contradicting argument Appellee waited to unveil until its summary judgment reply brief. Appx5979-5981. Appellee's failure to provide a written basis for its argument cannot be considered adequate for notice on Metacel or satisfaction of the Local Rules.

Further to the foregoing, this Court can rule in favor of Metacel here due to the district court's improper application of the local patent rules. This Court "defers to the district court when interpreting and enforcing local rules applicable to patent cases, so as not to frustrate local attempts to manage patent cases according to prescribed guidelines." *Genentech, Inc. v. Amgen, Inc.*, 289 F.3d 761, 762 (Fed. Cir. 2002). When this Court reviews a district court's exercise of discretion under a Local Rule, this Court determines "whether (1) the decision was clearly unreasonable, arbitrary, or fanciful; (2) the decision was based on an erroneous conclusion of law; (3) the court's findings were clearly erroneous; or (4) the record contains no evidence upon which the court rationally could have based its decision." *Id.* at 764 (citing *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1369, 51 USPQ2d 1321, 1329 (Fed.Cir.1999)).

The district court's application of Local Patent Rule 3.6 is arbitrary in light of its other recent holdings. *See Mylan Labs. Ltd.*, 20-CV-13103 (EP) (LDW), 2023 WL 3605733. In *Mylan*, defendant sought to introduce a divided infringement theory, which was presented for the first time in defendant's rebuttal expert report. That court denied defendant's attempt to do so because their "Non-Infringement Contentions, presented two theories, neither of which alleged divided infringement," and "[e]ven the most expansive reading of [defendant's] Non-Infringement Contentions would not reveal any divided infringement defense." *Id.* Because defendant's attempt to advance a novel non-infringe theory not found in their non-infringement contentions violated the Local Rules, the district court noted that: "Local Patent Rules exist to further the goal of full and timely discovery and provide all parties with adequate notice and information with which to litigate their cases," as well as to "require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed." *Id.* (citing *Celgene Corp. v. Hetero Labs Ltd.*, No. 17-3387, 2021 U.S. Dist. LEXIS 159262, at *12 (D.N.J. Mar. 29, 2021)). Notably, in the district court's Memorandum and Order denying Metacel's motion for reconsideration

here, the district court omitted the second purpose of "why Local Rules exist" (to "require parties to crystallize then theories of the case early in the litigation and to adhere to those theories once they have been disclosed"). Appx7. The facts of this case fall within the framework laid out by the district court as sufficient to bar entry of novel theory of non-infringement omitted from non-infringement contentions—that is, "[e]ven the most expansive reading of [defendant's] Non-Infringement Contentions would not reveal any [novel non-infringement theory] defense." *Id.*

The decision of district courts to deny entry of novel non-infringement theories not presented in their non-infringement contentions is not unique to the district court in this case, as other jurisdictions have held similarly. *See Sloan Valve Company v. Zurn Industries, Inc.*, 2013 WL 6132598, *11-*12 (N.D. Ill., November 10, 2013) (refusing to consider a noninfringement theory that the accused infringer first disclosed in a summary judgment brief and had not included in its noninfringement contentions). In *Sloan,* defendant, for the first time in its summary judgment brief, presented a new theory of non-infringement that was never disclosed in its final non-infringement

contentions and defendant did not seek leave to amend to amend its final non-infringement contentions to include this theory. *Id.* There, the district court further noted that "[plaintiff] did not have notice of this non-infringement argument[,]" and because "[defendant] failed to seek leave to amend its final non-infringement contentions to include this theory. It is now too late to do so." *Id. See Canon, Inc. v. Color Imaging, Inc.*, 227 F.Supp.3d 1303 (2016) (granting plaintiff's motion in limine to prohibit defendants from introducing [new] arguments or evidence [not presented in their non-infringement contentions]). In *Canon*, plaintiffs moved to exclude a new non-infringement theory, which defendants first introduced in their outline of the case as part of their joint pretrial order, asserting that, *inter alia*, defendants did not introduce this theory during claim construction or supplement their non-infringement contentions following claim construction, as required by Local Patent Rules. *Id.* The district court acknowledged that Defendants "did not comply with Patent Local Rule 4.5 with respect to their non-infringement contentions" and granted plaintiff's motion. *Id.*

Here, the district court did not establish any rationale as to why departure from the rules' strict mandates was appropriate aside from an

unsubstantiated and incorrect conclusion that the issues here were simpler than in other patent cases. CITE APPX FROM ABOVE. That type of reasoning that is untethered from the facts, law, and rules is categorically arbitrary and capricious. *See Amgen*, 289 F.3d at 762.

Accordingly, for at least the reasons set forth above, Rubicon's failure to present its Storage Limitation argument until its summary judgment reply failed to properly place Metacel on notice of Rubicon's argument in satisfaction of the district court's rules and controlling precedent. Thus, summary judgment based upon Rubicon's the Storage Limitation was prejudicial to Metacel and the district court's grant of summary judgment on that untimely argument was improper as arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's judgment granting Rubicon's summary judgment motion and deny summary judgment in favor of Metacel, or in the alternative, remand the case back to the district court to conduct proper fact-finding.

Dated: January 19, 2024.

Respectfully submitted,

*/s/* Matthew D. Zapadka

Matthew D. Zapadka
Kevin M. Bell
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave NW,
Suite 350S
Washington, DC 200037
(202) 677-4930

*Counsel for Plaintiff-Appellant*

# ADDENDUM

Addendum Table of Contents

CONFIDENTIAL MATERIAL OMITTED. The Supporting Memorandum Order is redacted for the purposes of the non-confidential brief. The Supporting Memorandum Order was sealed pursuant to the Stipulated Discovery Confidentiality Order filed on May 9, 2022.

Judgment Appealed From – D.E. 156 ....................................... Appx1

Sealed Memorandum Order – D.E. 155 [REDACTED] ........... Appx4

Metacel's Patent ................................................................... Appx6265

# FINAL JUDGMENT – D.E. 155

**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| METACEL PHARMACEUTICALS LLC,<br>*Plaintiff*,<br>v.<br>RUBICON RESEARCH PRIVATE LIMITED,<br>*Defendant*. | No. 2:21-cv-19463-EP-JRA |

**FINAL JUDGMENT**

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. This Court has jurisdiction over Plaintiff, Metacel Pharmaceuticals LLC (herein, "Metacel"), Defendant, Rubicon Research Private Limited (herein, "Rubicon"), and the subject matter of this action.

2. In accordance with the Court's July 7, 2023 Opinion and Order (D.E.s 137 and 138) and pursuant to Federal Rule of Civil Procedure 58, Final Judgment is entered in favor of Rubicon and against Metacel with respect to Plaintiff's Patent No. 10,610,502 ("the '502 patent"). Defendant's ANDA Product that is the subject of ANDA No. 214445 (the "Rubicon ANDA") does not infringe any claim of the '502 patent.

3. This Final Judgment is final with respect to Metacel's Complaint (D.E. 1) only.[1]

SO ORDERED this 31st day of August 2023.

Evelyn Padin, U.S.D.J.

[1] Rubicon's First Amended Answer to Complaint, Affirmative Defenses and, Counterclaim against Metacel Pharmaceuticals LLC (D.E. 153), filed on August 8, 2023 pursuant to Judge Almonte's August 7, 2023 Order (D.E. 152), survives this Final Judgment.

# [SEALED] MEMORANDUM ORDER – D.E. 156

# U.S. PATENT NO. 10,610,502

US010610502B1

(12) **United States Patent**
**Bryant et al.**

(10) **Patent No.: US 10,610,502 B1**
(45) **Date of Patent: Apr. 7, 2020**

(54) **ORAL BACLOFEN SOLUTIONS**

(71) Applicant: **Metacel Pharmaceuticals, LLC**, Athens, GA (US)

(72) Inventors: **Thomas Jeffrey Bryant**, Athens, GA (US); **H. Greg Thomas**, Athens, GA (US)

(73) Assignee: **Metacel Pharmaceuticals, LLC**, Athens, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/556,893**

(22) Filed: **Aug. 30, 2019**

(51) **Int. Cl.**

| | |
|---|---|
| ***A61K 9/08*** | (2006.01) |
| ***A61K 31/195*** | (2006.01) |
| ***A61K 47/14*** | (2017.01) |
| ***A61K 47/10*** | (2017.01) |
| ***A61K 47/26*** | (2006.01) |
| ***A61K 47/12*** | (2006.01) |

(52) **U.S. Cl.**
CPC .............. ***A61K 31/195*** (2013.01); ***A61K 9/08*** (2013.01); ***A61K 47/10*** (2013.01); ***A61K 47/12*** (2013.01); ***A61K 47/14*** (2013.01); ***A61K 47/26*** (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

10,300,015 B2 5/2019 Cohen et al.

OTHER PUBLICATIONS

Lioresal 5 mg/5 ml Oral Solution (baclofen) package insert (Sep. 2014).
Pharnext to Launch New Phase 3 Trial of PXT3003 for CMT1A, Sep. 25, 2019 (https:://charcot-marie-toothnews.com/2019/09/05/pharnext-to-launch-new-phase-3-trial-for . . . .
MHRA, Baclofen 5 mg/5 mL oral solution, PL 06464/2354 (Nov. 19, 2008).
MHRA, Baclofen 5 mg/5 mL oral solution, PL 17496/0024 (Aug. 2, 2010).
Lioresal Intrathecal (baclofen injection) package insert (Sep. 30, 2016).

*Primary Examiner* — Jennifer A Berrios
(74) *Attorney, Agent, or Firm* — Blank Rome LLP

(57) **ABSTRACT**

The present disclosure relates to aqueous oral solutions comprising baclofen. In one embodiment, the aqueous oral solutions comprise a buffer comprising citric acid, a salt of citric acid, or any combination thereof, and are stored at from about 2° C. to about 8° C. The present disclosure also relates to buffer free aqueous oral solutions comprising baclofen. Additionally, the present disclosure relates to an assay for determining the amount of an impurity, 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid, in a baclofen containing solution, and to methods of treatment using such aqueous oral solutions.

**2 Claims, No Drawings**

# ORAL BACLOFEN SOLUTIONS

## FIELD OF THE INVENTION

The present invention relates to aqueous oral solutions comprising baclofen. In one embodiment, the aqueous oral solution is stored at from about 2° C. to about 8° C. and comprises baclofen and a buffer comprising citric acid, a salt of citric acid, or any combination thereof. The present invention also relates to buffer free aqueous oral solutions comprising baclofen. Additionally, the present invention relates to an assay for determining the amount of an impurity, such as 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid, in a baclofen containing solution, and to methods of treatment using such aqueous oral solutions.

## BACKGROUND OF THE INVENTION

Baclofen is a skeletal muscle relaxant and antispastic agent. Baclofen is a structural analog of the inhibitory neurotransmitter gamma-aminobutyric acid (GABA), and may exert its effects by stimulation of the $GABA_B$ receptor subtype.

Lioresal™ Intrathecal (baclofen injection) has been developed for chronic intrathecal infusion for the management of severe spasticity. Baclofen is commercially available for intrathecal injection (Lioresal™ Intrathecal) as a 0.05 mg/mL solution, a 0.5 mg/mL solution or a 2 mg/mL solution having a pH of 5 to 7 in a formulation containing sodium chloride and water.

An oral baclofen solution was previously approved by the UK Medicines and Healthcare Products Regulatory Agency. The solution contained, among other ingredients, citric acid monohydrate and sodium citrate dihydrate. The instructions for the solution specified that it was not to be refrigerated or frozen.

There is a continuing need for safe and effective oral baclofen solutions.

## SUMMARY OF THE INVENTION

The present invention relates to aqueous oral solutions comprising baclofen. In one embodiment, the aqueous oral solution is stored at from about 2° C. to about 8° C. and comprises (i) baclofen, (ii) a buffer comprising citric acid, a salt of citric acid, or any combination thereof, and (iii) optionally one or more preservatives.

The present inventors have surprisingly found that baclofen reacts with citric acid to form the impurity 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid, the structure of which is shown below. When tested by high performance liquid chromatograph (HPLC), this impurity co-elutes with a commonly used preservative, methylparaben.






A novel assay has been developed to determine the amount of the impurity 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid in an oral baclofen containing solution. The assay involves performing ion pair chromatography.

The present inventors have also surprisingly found that aqueous oral baclofen may be stored at from about 2° C. to about 8° C. and inhibit the formation of the impurity 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid, while maintaining a functioning solution.

One embodiment of the invention is an aqueous oral solution comprising (i) baclofen, (ii) a buffer comprising citric acid, a salt of citric acid, or any combination thereof, and (iii) optionally one or more preservatives, where the solution is stored at from about 2 to about 8° C. The solution is formulated such that it remains a solution during storage and the baclofen does not precipitate out.

Another embodiment is a buffer-free aqueous oral solution comprising baclofen and one or more preservatives, wherein the solution contains less than about 0.2% of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid after storage at ambient temperature (e.g., 25° C.) and 60% relative humidity for 3 or 6 months. In another embodiment, buffer-free aqueous oral solution comprising baclofen and one or more preservatives, wherein the solution contains less than about 0.1% or is free of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid after storage at ambient temperature (e.g., 25° C.) and 60% relative humidity. In one embodiment, the amount of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid is determined by ion pair chromatography.

In one embodiment of any of the aqueous oral solutions described herein, the solution comprises from about 0.05 to about 0.3% w/v of baclofen, such as from about 0.1 to about 0.3% w/v of baclofen, or from 0.1 to about 0.2% w/v of baclofen.

In one embodiment of any of the aqueous oral solutions described herein, the solution comprises about 0.1% w/v of baclofen. In another embodiment, the solution comprises about 0.2% w/v of baclofen.

In one embodiment of any of the aqueous oral solutions described herein, the one or more preservatives comprise methylparaben, propylparaben, sodium benzoate, sodium methylparaben or a combination thereof. In another embodiment of any of the aqueous oral solutions described herein, the one or more preservatives comprise methylparaben, propylparaben, or a combination thereof. For instance, the oral solution may comprise methylparaben and propylparaben.

In one embodiment of any of the aqueous oral solutions described herein, the solution further comprises glycerin (for instance, as a wetting agent). For instance, the solution may include from about 2 to about 20% w/v, such as from about 5 to about 15% or from about 8 to about 12% w/v, of glycerin.

In one embodiment of any of the aqueous oral solutions containing a buffer described herein, the buffer comprises citric acid, sodium citrate, or a combination thereof. For instance, the oral solution may comprise citric acid and sodium citrate. In another embodiment of any of the aqueous oral solutions containing a buffer described herein, the buffer is a phosphate buffer, such as a sodium phosphate buffer.

In one embodiment of any of the aqueous oral solutions described herein, the solution comprises one or more flavoring agents, such as, e.g., natural grape flavor. Other

suitable flavoring agents include but, are not limited to, cotton candy, raspberry, strawberry, lemon-lime, apple and cherry flavors. In one embodiment, the solution comprises from about 0.1 to about 2% w/v flavoring agent (e.g., natural grape flavor), such as about 1.0% w/v flavoring agent.

In one embodiment of any of the aqueous oral solutions described herein, the solution comprises a sweetener, such as sucralose, sucrose, or sodium saccharin. In one embodiment, the solution comprises from about 0.001 to about 1% w/v sweetener. In one preferred embodiment, the solution comprises from about 0.001 to about 1% w/v sucralose, such as about 0.025% w/v sucralose.

In one embodiment of any of the aqueous oral solutions described herein, the pH of the aqueous oral solution ranges from about 4 to about 6 (e.g., from about 4.1 to about 6.0). In another of any of the aqueous oral solutions described herein, the pH of the aqueous oral solution ranges from about 4.3 to about 4.7. For instance, the pH may be 4.3, 4.4, 4.5, 4.6, or 4.7.

In one embodiment of any of the aqueous oral solutions described herein, the solution contains less than about 1%, such as less than about 0.5%, 0.4%, or 0.3% or less than about 0.2% of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid, after storage, for example, at 2-8° C. for about 3, 6, 9, 12, 18, or 24 months.

In another aspect, the present invention relates to an aqueous oral solution comprising baclofen and one or more preservatives, wherein the solution is free or substantially free (e.g. contains less than about 1% w/v, such as less than about 0.9% w/v, less than about 0.8% w/v, less than about 0.7% w/v, less than about 0.6% w/v, less than about 0.5% w/v, less than about 0.4% w/v, less than about 0.3% w/v, less than about 0.2% w/v, less than about 0.1% w/v, less than about 0.05% w/v, or less than about 0.01% w/v) of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid, for example, after storage, for example, at 2-8° C. for about 3, 6, 9, 12, 18, or 24 months.

In another aspect, the present invention relates to an aqueous oral solution comprising baclofen and one or more preservatives, wherein the solution contains less than about 0.2% of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid after storage at 2-8° C. for about 3, 6, 9, 12, 18, or 24 months, such as determined by ion pair chromatography. In one embodiment, the solution contains less than about 0.1% of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid after storage at 2-8° C. for about 3, 6, 9, 12, 18, or 24 months, such as determined by ion pair chromatography.

Another aspect relates to a method of determining the amount of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid present in an aqueous oral solution comprising baclofen or a batch of such an aqueous oral solution. The method comprises determining the amount of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid in the oral solution or a sample of the batch of oral solution by ion pair chromatography.

Yet another embodiment is a method of dispensing to a patient an aqueous oral solution comprising (i) baclofen, (ii) a buffer comprising citric acid, a salt of citric acid, or any combination thereof, and (iii) optionally one or more preservatives. The method comprises (i) storing the solution at from about 2 to about 8° C., and (ii) dispensing the solution to a patient.

Yet another embodiment is a method of determining the amount of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid in an aqueous oral solution comprising baclofen and a buffer comprising citric acid, a salt of citric acid, or any combination thereof by subjecting the oral solution to ion pair chromatography.

Yet another aspect is a method of relaxing muscles or treating spasticity (e.g., due to spinal cord injury or multiple sclerosis) in a subject in need thereof by administering an oral solution of baclofen as described herein.

## DETAILED DESCRIPTION OF THE INVENTION

### Definitions

The term "subject" or "patient" encompasses mammals and non-mammals. Examples of mammals include, but are not limited to, any member of the mammalian class: humans, non-human primates such as chimpanzees, and other apes and monkey species; farm animals such as cattle, horses, sheep, goats, and swine; domestic animals such as rabbits, dogs, and cats; and laboratory animals including rodents, such as rats, mice and guinea pigs. Examples of non-mammals include, but are not limited to, birds, fish and the like. In one preferred embodiment, the mammal is a human.

The terms "treat," "treating" or "treatment," as used herein, include alleviating, abating or ameliorating a disease, disorder or condition symptoms, preventing additional symptoms, ameliorating or preventing the underlying causes of symptoms, inhibiting the disease, disorder or condition, e.g., arresting the development of the disease, disorder or condition, relieving the disease, disorder or condition, causing regression of the disease, disorder or condition, relieving a condition caused by the disease, disorder or condition, or stopping the symptoms of the disease, disorder or condition either prophylactically and/or therapeutically.

As used herein, the term "flavoring agent" is intended to mean a compound used to impart a pleasant flavor and often odor to a pharmaceutical preparation. Exemplary flavoring agents include synthetic flavor oils and flavoring aromatics and/or natural oils, extracts from plants, leaves, flowers, fruits and so forth and combinations thereof. These may also include cinnamon oil, oil of wintergreen, peppermint oils, clove oil, bay oil, anise oil, eucalyptus, thyme oil, cedar leave oil, oil of nutmeg, oil of sage, oil of bitter almonds and cassia oil. Other useful flavoring agents include vanilla, citrus oil, including lemon, orange, grape (e.g., natural grape), lime and grapefruit, and fruit essences, including apple, pear, peach, strawberry, raspberry, cherry, plum, pineapple, apricot and so forth. In one embodiment, the flavoring agent is natural grape flavor. The amount of flavoring agent may depend on a number of factors, including the organoleptic effect desired. Preferred flavoring agents include grape and cherry flavors and citrus flavors such as orange.

Unless specified otherwise, "storage" of the oral solution (or being "stored") refers to storage in a polyethylene terephthalate container with a polypropylene cap. The container may also be made of any other suitable material such as polypropylene or high density polyethylene (HDPE).

### Buffered Oral Solutions

One embodiment of the invention is an aqueous oral solution comprising (i) baclofen, (ii) a buffer comprising citric acid, a salt of citric acid, or any combination thereof, and (iii) optionally one or more preservatives. The solution is preferably stored at from about 2 to about 8° C. (such as when stored in a pharmacy or by a distributor).

In one embodiment, the solution comprises from about 0.05 to about 0.3% w/v of baclofen, such as from about 0.1 to about 0.3% w/v of baclofen, or from 0.1 to about 0.2% w/v of baclofen. For example, the solution may comprise about 0.1% or about 0.2% w/v of baclofen.

The concentration of baclofen in the solution may be about 1 mg/mL. In another embodiment, the solution contains about 2 mg/mL of baclofen.

In one embodiment, the one or more preservatives comprise methylparaben, propylparaben, or a combination thereof. For instance, the oral solution may comprise methylparaben and propylparaben.

Preferably, the solution includes an effective amount of preservatives (such as methylparaben, propylparaben, sodium benzoate, sodium methylparaben, or a combination thereof) to inhibit microbial contamination of the solution. In one embodiment, the solution includes from about 0.01 to about 4% (such as from about 0.05 to about 1% or from about 0.05 to about 0.5%) of preservatives, such as methylparaben, propylparaben, or a combination thereof. In another embodiment, the solution includes from about 0.1 to about 0.2% of preservatives, such as methylparaben, propylparaben, or a combination thereof.

In one embodiment, the solution further comprises glycerin (for instance, as a wetting agent). For instance, the solution may include from about 2 to about 20% w/v, such as from about 5 to about 15% or from about 8 to about 12% w/v, of glycerin.

In one embodiment, the buffer comprises citric acid, sodium citrate, or a combination thereof. For instance, the oral solution may comprise citric acid and sodium citrate. In another embodiment, the buffer is a phosphate buffer, such as a sodium phosphate buffer (e.g., a mixture of monobasic sodium phosphate and dibasic sodium phosphate).

In one embodiment, the solution comprises one or more flavoring agents, such as, e.g., natural grape flavor. Other suitable flavoring agents include but, are not limited to, cotton candy, raspberry, strawberry, lemon-lime, apple and cherry flavors. The flavoring agent may be, for example, natural grape flavor. In one embodiment, the solution comprises from about 0.1 to about 2% w/v of flavoring agent (e.g., natural grape flavor), such as about 1.0% w/v of flavoring agent.

In one embodiment, the solution comprises a sweetener, such as sucralose, sucrose, or sodium saccharin. In another embodiment, the solution comprises from about 0.001 to about 1% w/v sweetener. In one preferred embodiment, the solution comprises from about 0.001 to about 1% w/v sucralose, such as about 0.025% w/v sucralose.

In one embodiment, the pH of the aqueous oral solution ranges from about 4 to about 6. In another embodiment, the pH of the aqueous oral solution ranges from about 4.3 to about 4.7. For instance, the pH may be 4.3, 4.4, 4.5, 4.6, or 4.7.

In one embodiment, the solution contains less than about 1%, such as less than about 0.5%, 0.4%, or 0.3% or less than about 0.2% of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid, after storage, for example, at 2-8° C. for about 3, 6, 9, 12, 18, or 24 months.

In one preferred embodiment, the oral solution is free or substantially free (e.g. contains less than about 1% w/v, such as less than about 0.9% w/v, less than about 0.8% w/v, less than about 0.7% w/v, less than about 0.6% w/v, less than about 0.5% w/v, less than about 0.4% w/v, less than about 0.3% w/v, less than about 0.2% w/v, less than about 0.1% w/v, less than about 0.05% w/v, or less than about 0.01% w/v) of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid, for example, after storage, for example, at 2-8° C. for about 3, 6, 9, 12, 18, or 24 months. The amount of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid can be determined by ion pair chromatography.

In one embodiment, the oral solution is free or substantially free of sorbitol.

Non-Buffered Oral Solutions

One embodiment is a buffer-free aqueous oral solution comprising baclofen and one or more preservatives, wherein the solution contains less than about 0.2% of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid after storage at ambient temperature (e.g., 25° C.) and 60% relative humidity for 3 or 6 months. In another embodiment, buffer-free aqueous oral solution comprising baclofen and one or more preservatives, wherein the solution contains less than about 0.1% or is free of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid after storage at ambient temperature (e.g., 25° C.) and 60% relative humidity. In one embodiment, the amount of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid is determined by ion pair chromatography.

In one embodiment, the oral solution is free or substantially free of sorbitol.

In one embodiment, the buffer-free aqueous oral solution comprises:

(i) baclofen (for example, in a concentration of about 1 mg/mL or about 2 mg/mL);

(ii) methylparaben, propylparaben, or a combination thereof;

(iii) sucralose;

(iv) a flavoring agent; and

(v) glycerin.

In one embodiment, the solution comprises from about 0.05 to about 0.3% w/v of baclofen, such as from about 0.1 to about 0.3% w/v of baclofen, or from 0.1 to about 0.2% w/v of baclofen. For instance, the solution may comprise about 0.1% w/v or about 0.2% w/v of baclofen.

Preferably, the solution includes an effective amount of preservatives (such as methylparaben, propylparaben, sodium benzoate, sodium methylparaben, or a combination thereof) to inhibit microbial contamination of the solution. In one embodiment, the solution includes from about 0.01 to about 4% (such as from about 0.05 to about 1% or from about 0.05 to about 0.5%) of preservatives, such as methylparaben, propylparaben, or a combination thereof. In another embodiment, the solution includes from about 0.1 to about 0.2% of preservatives, such as methylparaben, propylparaben, or a combination thereof.

The flavoring agent may be, for example, natural grape flavor. In one embodiment, the solution comprises from about 0.1 to about 2% w/v of flavoring agent (e.g., natural grape flavor), such as about 1.0% w/v of flavoring agent.

In one embodiment, the solution comprises a sweetener, such as sucralose. In one embodiment, the solution comprises from about 0.001 to about 1% w/v sucralose, such as about 0.025% w/v sucralose.

In one embodiment, the pH of the aqueous oral solution ranges from about 4 to about 6. In another embodiment, the pH of the aqueous oral solution ranges from about 4.3 to about 4.7. For instance, the pH may be 4.3, 4.4, 4.5, 4.6, or 4.7.

In another embodiment, the buffer-free aqueous oral solution comprises:

(i) about 0.10% w/v baclofen;
(ii) about 0.15% w/v methylparaben;
(iii) about 0.02% w/v propylparaben;
(iv) about 0.025% w/v sucralose;
(v) about 1.0% w/v flavoring agent (e.g., natural grape flavor); and
(vi) about 10% w/v glycerin.

In yet another embodiment, the buffer-free aqueous oral solution comprises:

(i) about 0.20% w/v baclofen;
(ii) about 0.15% w/v methylparaben;
(iii) about 0.02% w/v propylparaben;
(iv) about 0.025% w/v sucralose;
(v) about 1.0% w/v flavoring agent (e.g., natural grape flavor); and
(vi) about 10% w/v glycerin.

Preparation of Solutions

The baclofen solution can be prepared by, for example, initially heating water and incorporating the preservative (such as parabens) with mixing. The other components, such as a buffer, sweetener, and flavoring agent, are added with mixing. Baclofen may then be added. The baclofen may be wetted (for instance, by mixing with glycerin) prior to being added with the other components. This allows for complete dissolution of the baclofen.

The baclofen solutions described herein may be placed in any suitable container with a suitable cap. The container may be made of polyethylene terephthalate, polypropylene, or high density polyethylene (HDPE). In one embodiment, the container is made of polyethylene terephthalate. The cap may be made of polypropylene.

Method of Dispensing

Another embodiment is a method of dispensing to a patient an aqueous oral solution comprising (i) baclofen, (ii) a buffer comprising citric acid, a salt of citric acid, or any combination thereof, and (iii) optionally one or more preservatives. The method comprises (i) storing the solution at from about 2 to about 8° C., and (ii) dispensing the solution to a patient. The oral solution may be stored and dispensed by, for instance, a pharmacy.

Yet another embodiment is a method of dispensing to a patient a buffer-free aqueous oral solution as described herein. The method comprises (i) storing the solution at from about 2 to about 8° C. or at ambient temperature (e.g., 25° C.), and (ii) dispensing the solution to a patient. The oral solution may be stored and dispensed by, for instance, a pharmacy.

Yet another embodiment is a method of dispensing to a patient a buffer-free aqueous oral solution as described herein. The method comprises (i) storing the solution at ambient temperature (e.g., 25° C.), and (ii) dispensing the solution to a patient. The oral solution may be stored and dispensed by, for instance, a pharmacy.

Assay

Yet another embodiment is a method of determining the amount of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid in an aqueous oral baclofen solution by subjecting the oral solution to ion pair chromatography. The chromatography can be normal phase liquid chromatography, reverse phase liquid chromatography, or liquid chromatography-mass spectrometry.

The ion pair chromatography may be performed with an ion pair reagent. A suitable ion pair reagent is an alkyl sulfonate, such as sodium 1-pentanesulfonate.

In one embodiment, the mobile phase comprises the ion pair reagent and a buffered acidic solvent. In one embodiment, the buffered acidic solvent comprises methanol, acetic acid, and sodium acetate.

Methods of Treatment

Yet another aspect is a method of relaxing muscles or treating spasticity (e.g., due to spinal cord injury or multiple sclerosis) in a subject in need thereof by administering an oral solution of baclofen as described herein.

One embodiment is a method of relaxing muscles or treating spasticity in a subject in need thereof by orally administering an aqueous oral solution comprising (i) baclofen, (ii) a buffer comprising citric acid, a salt of citric acid, or any combination thereof, and (iii) optionally one or more preservatives, wherein the oral solution contains less than 0.2% 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid as determined by ion pair chromatography.

Another embodiment is a method of relaxing muscles or treating spasticity in a subject in need thereof comprising:

(a) determining the amount of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid in an aqueous oral solution as described herein (such a solution comprising (i) baclofen, (ii) a buffer comprising citric acid, a salt of citric acid, or any combination thereof, and (iii) optionally one or more preservatives); and

(b) administering an effective amount of the oral solution to the subject when the amount of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid is below a threshold level.

In one embodiment, the threshold level is 0.2%. In a preferred embodiment, the threshold level is 0.1, 0.05, or 0.02%. These percentages can be determined by the area in the chromatograms from an HPLC.

Yet another embodiment is a method of relaxing muscles or treating spasticity in a subject in need thereof comprising administering to the subject an effective amount of an aqueous oral solution comprising (i) baclofen, (ii) a buffer comprising citric acid, a salt of citric acid, or any combination thereof, and (iii) optionally one or more preservatives, wherein prior to the administration, the amount of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid in the oral solution is determined to be below a threshold level and the oral solution is stored after the determination, but prior to the administration, at from about 2 to about 8° C.

In one embodiment, the threshold level is 0.2%. In a preferred embodiment, the threshold level is 0.1, 0.05, or 0.02%. These percentages can be determined by the area in the chromatograms from an HPLC.

Yet another embodiment is a method of relaxing muscles or treating spasticity in a subject in need thereof comprising administering an effective amount of an oral baclofen solution to the subject, where (a) the solution comprises (i) baclofen, (ii) a buffer comprising citric acid, a salt of citric acid, or any combination thereof, and (iii) optionally one or more preservatives, and (b) the amount of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid in the solution was determined as described herein to be below a threshold level. In one embodiment, the threshold level is 0.2%. In a preferred embodiment, the threshold level is 0.1, 0.05, or 0.02%. These percentages can be determined by the area in the chromatograms from an HPLC.

## EXAMPLES

### Example 1

An oral baclofen solution containing a buffer having the formulation in Table 1 below is prepared as follows. A predetermined amount of water (75% of the total water required) is charged into a jacketed tank capable of heating and large enough to hold the entire batch. The water is heated to 75-80° C. with mixing. Propylparaben is added and mixed for 30-45 minutes. Methylparaben is added and mixed for 15-30 minutes. Upon complete dissolution of the parabens, temperature of the solution is reduced to less than 25° C. Citric acid (mix for 15-30 min.), sucralose (mix for 15-30 min.), sodium citrate dihydrate (mix for 30-60 min,) and grape flavor (mix for 15-30 min.) are added to form a main batch. In a separate vessel large enough to hold the predetermined amount of required glycerin, begin mixing the glycerin and slowly add the baclofen into the vortex of the mixer. When the baclofen is well dispersed in the glycerin and after mixing for 30-60 minutes, transfer the mixture into the main batch with a suitable size pump. The mixture is mixed for an additional 30-60 minutes. The pH is adjusted if necessary. Sufficient water is added and the solution is mixed for 30 minutes.

TABLE 1

| Ingredient | % w/v |
|---|---|
| Purified water USP | 75.000 |
| Propyl paraben NF | 0.020 |
| Methyl paraben NF | 0.150 |
| Citric acid anhydrous USP | 1.200 |
| Sucralose NF | 0.025 |
| Sodium citrate dihydrate USP | 1.850 |
| Natural grape flavor | 1.000 |
| Glycerin 99% USP | 10.000 |
| Baclofen USP | 0.100 |
| Sodium hydroxide NF/Purified water USP/ Hydrochloric acid 10% NF | to achieve pH 4.3 to 4.7 |
| Purified water USP | q.s. |

### Example 2

A 1 mg/mL oral baclofen solution without a buffer having the formulation in Table 2 below was prepared by the procedure described in Example 1.

TABLE 2

| Ingredient | % w/v |
|---|---|
| Baclofen | 0.100 |
| Methyl paraben NF | 0.150 |
| Propyl paraben NF | 0.020 |
| Sucralose NF | 0.025 |
| Natural grape flavor | 1.000 |
| Glycerin 99% USP | 10.000 |
| Purified water USP | 91.705 |

### Example 3

A 2 mg/mL oral baclofen solution without a buffer having the formulation in Table 3 below was prepared by the procedure described in Example 1.

TABLE 3

| Ingredient | % w/v |
|---|---|
| Baclofen | 0.200 |
| Methyl paraben NF | 0.150 |
| Propyl paraben NF | 0.020 |
| Sucralose NF | 0.025 |
| Natural grape flavor | 1.000 |
| Glycerin 99% USP | 10.000 |
| Purified water USP | 91.605 |

### Example 4

The following test method can be used to determine the amount of impurities, such as 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid, present in a baclofen oral solution. HPLC is performed using ion pair chromatography and two mobile phases, each containing acetic acid buffer (acetic acid and sodium acetate), methanol, and sodium 1-pentanesulfonate and differing in the concentration of acetic acid buffer and methanol. The column was a reverse phase C18 column.

One mobile phase is used until the peaks of interest have eluted. After, a gradient is created by mixing the first and second mobile phases. Several excipient peaks elute late into the run, and a gradient with a higher concentration of methanol in the mobile phase was added at the end of the run, to allow the final peaks to elute quicker.

Although the invention herein has been described with reference to particular embodiments, it is to be understood that these embodiments are merely illustrative of the principles and applications of the present invention. It is therefore to be understood that numerous modifications may be made to the illustrative embodiments and that other arrangements may be devised without departing from the spirit and scope of the present invention as described above. It is intended that the appended specification define the scope of the invention and that methods and structures within the scope of these specification and their equivalents be covered thereby.

All publications, patents and patent applications cited in this application are herein incorporated by reference to the same extent as if each individual publication, patent or patent application was specifically and individually indicated to be incorporated herein by reference.

What is claimed is:

**1**. A method of relaxing muscles or treating spasticity in a subject in need thereof comprising administering to the subject an effective amount of an aqueous oral solution comprising (i) baclofen, (ii) a buffer comprising citric acid, a salt of citric acid, or any combination thereof, and (iii) optionally one or more preservatives, wherein prior to the administration, the amount of 4-(3-carboxymethyl)-3-hydroxy-2,5-dioxopyrrolidin-1-yl)-3-(4-chlorophenyl)butanoic acid in the oral solution is determined to be below a threshold level and the oral solution is stored after the determination, but prior to the administration, at from about 2 to about 8° C.

**2**. The method of claim **1**, wherein the threshold level is 0.2%.

* * * * *

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2024, a true and correct copy of the foregoing was served on all counsel of record who have appeared in this case via the Court's CM/ECF system.

Dated: January 19, 2024.

*/s/* Matthew D. Zapadka

Matthew D. Zapadka
Kevin M. Bell
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave NW,
Suite 350S
Washington, DC 200037
(202) 677-4930

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Fed. Cir. R. 32(b) because it contains 10,197 words, excluding the parts of the brief exempt by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

Dated: January 19, 2024.

Respectfully submitted,

/s/ Matthew D. Zapadka

Matthew D. Zapadka
Kevin M. Bell
ARNALL GOLDEN GREGORY LLP
2100 Pennsylvania Ave NW,
Suite 350S
Washington, DC 200037
(202) 677-4930

*Counsel for Plaintiff-Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** No. 23-2386

**Short Case Caption:** Metacel v. Rubicon

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains fifteen (15) number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 01/19/2024

Signature: /s/ Matthew D. Zapadka

Name: Matthew D. Zapadka